NOTICE
Decision filed 04/15/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240600-U

NO. 5-24-0600

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Williamson County. |
| | ) | |
| v. | ) | No. 22-CF-337 |
| | ) | |
| NATHAN N. CLARK, | ) | Honorable |
| | ) | Michelle M. Schafer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Hackett and Bollinger concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction and sentence are affirmed where defendant's speedy trial rights were not violated, the requirements for plain-error review related to the hearsay testimony were not met, additional errors were precluded by the invited error doctrine, and defendant's claims of ineffective assistance of counsel had no merit.

¶ 2    Following a jury trial, defendant, Nathan N. Clark was found guilty of first degree murder and sentenced to 40 years' imprisonment. On appeal, defendant contends that his speedy trial rights were violated, the trial court abused its discretion by allowing hearsay excepted testimony at the trial, the jury was coerced into reaching its verdict, and his counsel provided ineffective assistance. For the following reasons, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4    On July 1, 2022, defendant was charged, by information, with three counts of first degree murder related to the stabbing death of Kerry Anthony on June 30, 2022. Two counts were alleged under section 9-1(a)(1) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1) (West 2020)), and one count was alleged under section 9-1(a)(2) of the Code (*id*. § 9-1(a)(2)). Defendant was arrested on June 30, 2022, and following his first appearance, bail was set at $1 million. Defendant's preliminary hearing was held on July 15, 2022. Probable cause was found and defendant waived a formal reading of the charges, pled not guilty, requested a jury trial, and interim pretrial hearings to ensure timely exchange of the evidence.

¶ 5    At the August 5, 2022, pretrial hearing, the State advised the court that it had received the discovery from the State police and planned to exchange the material by August 15, 2022. At the August 15, 2022, pretrial hearing, defense counsel stated that it had received some discovery but, after review, noted that significant amounts of discovery remained missing, including interviews, forensics, and everything from the Williamson County Sheriff's office. The State advised that it expected those materials by August 29, 2022, and another pretrial hearing was scheduled. The court calculated that October 28, 2022, was the last day for speedy trial and set the case for trial on October 11, 2022. On August 29, 2022, the expected discovery was not received and a motion to compel discovery was filed by defense counsel.

¶ 6    On September 16, 2022, the State moved for a 60-day continuance from the October 11, 2022, hearing date. It advised that it was waiting on DNA reports from the crime lab and the autopsy report. The court granted the continuance over defendant's objection and reset the trial for December 12, 2022. The parties returned for another pretrial hearing on September 30, 2022. At

that time, the State advised that it had not received the results from the crime lab. Defense counsel stated it was ready for trial and defendant also mentioned his speedy trial rights.

¶ 7    At the October 12, 2022, pretrial hearing, the State indicated it tendered a three-ring binder of material and a number of DVDs. It noted, however, that the autopsy pathologist was ill and was unable to get to the lab to complete the report. Defense counsel moved to discharge the motion to compel because the additional discovery remaining was out of the State's hands.

¶ 8    On November 15, 2022, defense counsel filed motions *in limine* to keep any uncharged offenses and hearsay out of the trial. The hearsay motion related to statements made by Anthony about who stabbed him to a police officer and his uncle. The State argued that the hearsay was admissible as a dying declaration or as an excited utterance. Counsel also filed a second motion to compel related to unreceived discovery. On November 16, 2022, the State advised that it had not yet received all of the discovery materials. Defense counsel made a record stating that they objected to any extension and defendant did not wish to waive his right to speedy trial. On November 18, 2022, the State provided the lab reports and a complete copy of its file. Dates were set for follow up and hearings on the motions *in limine*. Defendant's motion to compel was heard on November 23, 2022. Most, but not all, of the evidence had been received, and the State orally requested a motion to continue. The court stated the issue would be addressed at a later hearing.

¶ 9    On December 1, 2022, the defendant's motions *in limine*, and the State's motion for continuance were heard. The court started with the hearsay motion. Defense counsel advised that the two witnesses who heard Anthony's statements, Teran Jones and Deputy Terry Fann, were unavailable to attend the hearing but the parties stipulated that both Jones and Deputy Fann would state that Anthony told them that defendant stabbed him. Defense counsel called Perry Watkins, of the Carterville Fire Department and part-time ambulance service employee, to testify. Watkins

3

stated that the victim was sitting in a chair talking when they first arrived. Watkins did not know what the victim said or what anyone else said at the scene because Watkins was focused on finding the wound. He stated that any puncture wound could be a fatal wound, but he did not think Anthony's puncture wound was deep. He admitted that Anthony later stated that he was dying or was close to it. He agreed that when he spoke with counsel earlier in the week, he failed to mention that information. Watkins stated that at the scene, the victim was in distress, but they were able to calm him down so he could talk to them and determine the extent of his injuries. When Anthony was placed into the ambulance, his lung sounded normal and clear. However, at a later point, Anthony grabbed Watkins's hand and looked him directly in the eye. No words were exchanged but Watkins stated that Anthony looked at him "like I know something's happening."

¶ 10    On cross-examination, Watkins explained that Anthony was hyperventilating and fidgety when he was examined. After they loaded Anthony into the ambulance, they stopped at the Carterville fire department to pick up another employee to assist with cardiopulmonary resuscitation (CPR) after Anthony stopped breathing in the ambulance. Watkins believed they were only on scene for about five minutes.

¶ 11    Brandon Roland testified that he worked at the Carterville Fire Department and was the paramedic at the scene. He stated that when they arrived Anthony was in a chair in the back yard. They saw blood and found a stab wound to the left chest. He stated that Officer Shawn Dobbins was also there, along with one of Anthony's family members. Sheriff deputies arrived when they were putting Anthony on a stretcher. Roland testified that he overheard a conversation between the officers and Anthony but not enough to remember what was said. Roland stated he knew at the time there was potential for the injury to be very serious, but he did not think the victim would be dead before they reached the hospital. He did not recall Anthony stating that he was dying. Roland

4

stated that although Anthony was anxious, he was coherent and could answer questions. Roland identified a patient care report that indicated the ambulance was dispatched at 6:37 a.m. and arrived on scene at 6:48 a.m. The report indicated they left the scene at 7:07 a.m. Roland confirmed that he was with Anthony the entire time and Anthony became even more anxious in the ambulance. Roland stated that within one to two minutes after they left the scene, Anthony went into arrest. They stopped at the fire department to pick up Jason Sheradan to assist with CPR. From there, they went straight to Carbondale ER.

¶ 12     On cross-examination, Roland agreed that Anthony was alert when they arrived at the scene. He stated that Anthony's skin was clammy, he was breathing hard and was complaining of pain to his back and chest. Shortly after they left, Anthony's extremities stiffened and contracted, his gaze fixed in one direction, and he became unresponsive. He opined that Anthony was either anxious or having "compensated shock." Anthony died after they attempted to resuscitate him at the hospital. Roland did not recall telling the investigating officer that Anthony informed him that he had a stab wound.

¶ 13     The State requested the court listen to the 911 call. Defendant objected. The State indicated that it went to defendant's state of mind and the court listened to the 911 call where defendant can be heard trying to breathe in the background. The court noted that it heard Anthony say he had been stabbed twice and was groaning in the background.

¶ 14     Defense counsel argued that the statements were inadmissible hearsay and there was no evidence that Anthony's statement was a dying declaration provided to the officer at the scene when he was being questioned. Defense counsel stated it was the State's burden to prove to the court beyond a reasonable doubt the dying declaration applied and it failed to prove the dying

5

declaration applied. Defense counsel requested that Anthony's statements to Deputy Terry Fann and to his cousin, Teran Jones, be excluded.

¶ 15    The State argued that it met its burden, noting that Anthony died less than one hour after the statements were made. It further argued that the ambulance crew "didn't understand the nature of [Anthony's] injuries" or "how serious these injuries were." The State argued,

> "They thought Mr. Anthony was hyperventilating. You can hear him breathe on the 911 call. That did not sound like hyperventilating to me. That sounded more like a death rattle, if we are going to be frank about it. *** Mr. Anthony was clearly, clearly in distress. And his cousin was there next to him, kept telling him to breathe, breathe, breathe."

The State argued that the statements were provided a short time after the stabbing, Anthony was anxious and in distress, and therefore, the "statements could be considered not only a dying declaration but excited utterances as well." The State, citing *People v. Walker*, 262 Ill. App. 3d 796, 802 (1994), stated that the court could consider the circumstances surrounding the statement including the nature of the wound as evidence of the victim's state of mind. In response, defense counsel argued that the evidence revealed a traumatic injury and the medical professionals on scene stated it was serious but not fatal, in their opinion. Defense counsel further stated, as to excited utterance, that the State presented nothing to support that theory. The court took the matter under advisement and stated a ruling would be issued the following morning.

¶ 16    Thereafter, the court addressed the State's motion to continue. Ultimately, the issue was tabled because the evidence was received and the State was going to discuss the matter with defense counsel.

6

¶ 17    The parties returned on December 2, 2022. The court agreed that Anthony's statements to Jones and Deputy Fann were hearsay testimony rendering it inadmissible unless there was an exception. The court addressed the testimony from Walker and Roland as well as the sounds made by Anthony during the 911 call. Ultimately, the court found it had reasonable doubt as to whether the statements were dying declarations and ruled that the out of court statements from Anthony to Jones and Deputy Fann would not be admitted into evidence at trial under the dying declaration exception.

¶ 18    Thereafter, the court addressed the State's motion to continue. The State advised that it was no longer requesting the extension based on DNA. The requested continuance was because the pathologist, Dr. Christopher Kiefer, was not available for testimony the week of the trial. The State further advised that defendant had been in custody since June 30, 2022, which put them beyond the time of any extension and therefore also presented a motion to release defendant from custody on a recognizance bond. The State then noted that defendant was also in custody on recently filed aggravated domestic battery charges (case No. 22-CF-709) and requested a bond increase in that case from $50,000 to $150,000 because it involved the same victim as case No. 21-CF-25. The State further noted a third case (case No. 21-CF-64) involving Don Taylor, who was scheduled to testify in Anthony's murder trial. In response, defense counsel reminded the court of defendant's request for speedy trial and that one extension was previously granted over defendant's objection. Defense counsel objected to any increase in defendant's bond in case No. 22-CF-709.

¶ 19    The court granted the State's motion to continue due to the inability of Dr. Kiefer to appear at the time of the scheduled trial and the State's motion to issue a recognizance bond for $1 million. The court also increased defendant's bond in case No. 22-CF-709 to $100,000.

7

¶ 20    On January 18, 2023, the court issued a final pretrial order setting the case for jury trial on March 20, 2023. On March 13, 2023, the State filed a motion related to the hearsay evidence and requested clarification of the court's December 2, 2022, order. Therein, the State noted that the court did not issue a ruling on the excited utterance exception. On March 14, 2023, defense counsel filed a motion *in limine* requesting the court prohibit the State from playing Teran Jones's 911 call due to Jones's statements about who stabbed Anthony.

¶ 21    The motions were heard on March 15, 2023, and taken under advisement. On March 16, 2023, defense counsel filed a motion to dismiss for a speedy trial violation in the murder case based on the trial court allowing the recognizance bond but increasing the bail in defendant's aggravated battery case. On March 17, 2023, the court issued its rulings on the pending motions. As to the hearsay and the excited utterance exception, the court denied defense counsel's motion *in limine* to bar the hearsay, finding that the excited utterance exception applied. As to the 911 call, the court stated that as long as Jones testified and laid a proper foundation, it would allow a portion of the 911 audio call but stated that the call had to be stopped after Teran Jones referenced defendant because the remainder was too prejudicial. Defense counsel objected, stating that the call was hearsay supporting in court testimony which was improper. The court then stated it would wait to hear Jones's testimony before allowing the 911 call to be played. The court also denied defendant's motion to dismiss based on speedy trial, relying on the statutory allowance related to evidence. The court found defendant was in custody from June 30, 2022, to December 2, 2022, one requested continuance was granted for statutory reasons, and his right to speedy trial was not violated.

¶ 22    On September 22, 2023, defendant filed another motion *in limine* regarding pending criminal offenses. While defendant pled guilty to aggravated battery against Denise Campbell in

case No. 22-CF-709 on March 24, 2023, and received 30 months of conditional discharge, case Nos. 21-CF-64 and 21-CF-65 remained pending and also involved witnesses in defendant's murder trial. Defendant advised the court that he believed the 2021 cases had been dropped because Don Taylor changed his testimony and Denise Campbell no longer wished to prosecute. The court assured defendant that the cases remained pending. The court took the motion under advisement and stated it would require the State to make a proffer if they intended to present testimony for the purpose of rehabilitating a witness.

¶ 23    On October 3, 2023, defendant's trial began and jury selection occurred over the first two days. On October 5, 2023, the parties provided opening argument and both the State and defense counsel addressed the hearsay statements during their arguments.

¶ 24    The first witness was Officer Sean Dobbins who worked for the Carterville Police Department. He testified that he was dispatched on June 30, 2022, around 6:45 a.m. to a stabbing on Johnson Street in Colp, Illinois. When he arrived, Teran Jones was standing on the side of the road waving them down and advised him that his cousin had been stabbed. Jones took the officer to Anthony who was sitting upright in a chair holding his chest. Anthony was holding his chest and saying that he had been stabbed. The officer lifted the sweatshirt and saw what looked to be a stab wound in Anthony's upper left chest. Shortly thereafter, Carterville EMS arrived and the paramedics began to treat the victim. After the ambulance left the area, Officer Dobbins taped off the scene and secured the outer premises for evidentiary purposes.

¶ 25    On cross-examination, Officer Dobbins stated that he was first to arrive and others arrived within two to three minutes. He agreed that Deputy Fann was the officer from the Williamson County Sheriff's department who arrived about a minute later and was present when Officer Dobbins was assessing Anthony's injuries. The ambulance arrived shortly thereafter because it

was waiting for the officers to tell them it was safe to proceed. Officer Dobbins testified that he did not recall any particular name given over dispatch as to the suspect. He did not see defendant anywhere near the victim and stayed with the victim until he was taken to the ambulance.

¶ 26 Deputy Fann testified that he was working for the Williamson County Sheriff's office on June 30, 2022. He was dispatched to the scene around 6:45 a.m. for the stabbing. He stated that an ambulance and a Carterville police officer were at the scene when he arrived. He stated that Illinois State Police troopers arrived shortly after him. Deputy Fann went to the rear of the residence and spoke with Anthony before EMS loaded him onto the ambulance. Deputy Fann stated that Anthony was alert when he saw him and was able to answer questions. A side bar was held, at which time the State told the court that it was going to question the witness as to what he was told by the victim. The State further advised that it was asking not for the truth of the matter asserted but to show the effect on the officer and why the officers were searching for a certain person. Defense counsel stated it would object to make the record, and the court stated, "I understand. Okay. Thank you. I understand." Following the sidebar, the officer stated that he asked Anthony what happened. When asked what Anthony told the officer, defense counsel objected on the basis of hearsay. The State responded that it was not proving the truth of the matter asserted but merely to show the effect on the listener. The court overruled the objection and told Deputy Fann to answer the question. Deputy Fann responded by saying, "He stated that Nathan Clark had stabbed him in the chest." After Anthony provided that information, Deputy Fann advised law enforcement so they could begin looking for defendant. Deputy Fann stated that he was not part of the search. He stayed to secure the scene that was later turned over to the state police.

¶ 27 On cross-examination, Deputy Fann stated that he did not recall ever hearing a suspect's name broadcast by dispatch. He asked Anthony for identification, and he provided an identification

10

card. The encounter took seconds. Deputy Fann stated that the wallet was in Anthony's back pocket and Deputy Fann confirmed that Anthony was able to retrieve the wallet himself. Deputy Fann clarified that he asked Anthony what happened before he asked for Anthony's identification. Thereafter, Deputy Fann provided the name of the suspect over his radio. He did not know if it was broadcast directly to the officers or if dispatch sent it. Deputy Fann was unable to collect any further information due to the severity of Anthony's injury.

¶ 28    Captain Jeff Moore testified that he worked for the Williamson County Sheriff's office and was dispatched to the South Johnson address. He arrived after Deputy Fann. Officer Dobbins and the ambulance were on scene. Illinois State Police troopers arrived, and Captain Moore directed them to assist securing the scene. Captain Moore explained that the investigation was later handed over to the State police because another incident occurred in the county on the same day and all the detectives were working the second crime scene. Captain Moore testified that a suspect was identified while he was at the scene and a search was started for Nathan Clark, the defendant. Captain Moore participated in the search and defendant was located by Deputy Bisaillon at the intersection of Colp Street and Third Street in Colp. On cross-examination, Captain Moore testified that the suspect was located several blocks away from the crime scene.

¶ 29    Deputy Brayden Bisaillon testified that he was working for the Williamson County sheriff's office when he was dispatched to the Johnson Street address. When he arrived, he spoke with Captain Moore. Anthony was already in the ambulance. Deputy Bisaillon began a search for Nathan Clark and headed to Denise Campbell's residence. Defendant was not at that residence. He later received a radio call from Deputy Fann stating that defendant was spotted near 100 Davis Street, so Deputy Bisaillon relocated to that area. When he was at the corner of Colp Street and Third Street, the deputy saw defendant walking out of the tree line heading northbound on Colp

11

Street. He explained that Captain Anderton and Master Sergeant Bundren of the Illinois State Police were also in the area in their parked vehicles. He stated that defendant walked in between the Illinois State Police vehicles. Deputy Bisaillon drove around the Illinois State Police vehicles to apprehend defendant and ordered defendant to stop. Defendant turned to him and said, "My name is not Nathan" and kept walking. Deputy Bisaillon caught up with defendant and told him to get on his knees. Defendant refused so he was assisted to the ground and handcuffed. Defendant repeatedly stated that his name was Everett. Defendant was searched. No weapons were found but a prescription pill bottle for "Nathan Clark" was found in defendant's pocket. The officer confirmed the suspect's identity with a photograph and stated the suspect's name was Nathan, not Everett. Deputy Bisaillon stated that defendant's mother lived in that area and that was the direction defendant was traveling toward when he was apprehended. Defendant was taken into custody at 8:01 a.m. on June 30, 2022, transported to the police station, and was turned over to Officer Kelley.

¶ 30    On cross-examination, Deputy Bisaillon described the area where defendant was seen. He confirmed that defendant was not running or trying to hide his face and walked between two parked, clearly visible, Illinois State Police vehicles that were approximately 50 to 75 yards apart. The deputy did not recall what defendant was wearing and stated that the Illinois State Police troopers joined him in making the arrest. He stated that he was advised of the person of interest from dispatch. He did not participate in any search for physical evidence.

¶ 31    Special Agent James Minckler testified that he was working as an Illinois State Police Crime Scene Investigator (CSI) on June 30, 2022. He conferred with officers who were already on scene at the Johnson Street residence and then began the process of documenting the crime scene via photographs. He identified his photographs and explained what they depicted. He also collected

12

physical evidence and put it in a bag after it was photographed. He identified a yellow sweatshirt and green t-shirt taken into evidence at the scene. He did not locate any weapons at the scene.

¶ 32    On cross-examination, Agent Minckler confirmed that a liquor bottle was located in the vicinity of the crime scene but was not collected as evidence. He stated that he saw no sign of a struggle or disturbance. He also confirmed that he collected the chairs that were in the yard and covered with a red blood-like substance.

¶ 33    Timothy Hefner testified that he worked as a nurse in the Carbondale Memorial Hospital emergency room on June 30, 2022. He stated that CPR was in process when Anthony arrived at the hospital. The emergency room personnel worked on Anthony but ultimately determined it was medically futile to continue with resuscitation efforts. Hefner stated that Carterville EMS told them Anthony had a seizure prior to arrival. Hefner averred that Anthony never showed any signs of life once he arrived at the hospital. Anthony's body was turned over to Detective Hudson of the Herrin Police Department. Hefner identified hospital photographs of Anthony and confirmed that Anthony's clothes were given to law enforcement.

¶ 34    Trooper Shawn Isaacs of the Illinois State Police testified that he was the evidence custodian for Troop 10 and Zone 7. Evidence in this case was placed in the drop box on July 1, 2022, and Trooper Isaacs first saw the evidence on July 5, 2022. He identified Anthony's clothing from the hospital as well as defendant's clothing. Defendant's pockets contained a bottle of Canadian whiskey, a cell phone with a charger, a lighter, and a medication bottle. He also received the defendant's buccal swabs, defendant's fingernail scapings, and the postmortem samples.

¶ 35    Detective Ryan Hudson of the Herrin Police Department testified that he was dispatched to the Johnson Street address. Upon arrival, Detective Hudson was sent to the Carbondale hospital

13

to sit with the victim. He remained with the body until the deputy coroner and CSI Glover arrived. Nurse Hefner provided Hudson with a bag containing Anthony's clothing.

¶ 36    Teran Jones testified that he was a cousin to both Anthony and defendant. On June 30, 2022, around 6:15 a.m., Jones was in his trailer and about to go to sleep. He heard a vehicle pull up, and a car door shut around 6:30 or 6:45 a.m. Jones believed it was Anthony getting dropped off by another cousin named Terrence. Jones explained that Anthony stayed in the shed on the back of the property. Thereafter, Jones heard some screaming from the direction of the shed. He remained in bed at first. However, when he heard screaming again, he jumped up and ran outside. Jones saw Anthony running from the shed, holding his chest, screaming. Anthony's yellow hoodie was covered in blood. Jones asked Anthony what happened and Anthony said he got stabbed. Jones asked Anthony who stabbed him. Anthony told Jones who stabbed him and Jones took Anthony back to the front of the shed where there was a chair. Jones proceeded to try to keep Anthony alive by pressing on Anthony's chest to keep it from bleeding out. Jones called 911 and tried to keep Anthony calm.

¶ 37    Jones testified that before he made the 911 call, he saw defendant and Denise Campbell walking through the yard. Based on Anthony's previous response as to who stabbed him, Jones asked defendant why he stabbed Anthony. Defendant responded by stating, "He crossed the Clark group for the wrong last time." Jones told defendant to get off the property and Jones proceeded to tend to Anthony. He stated that Anthony kept saying "I'm going to die" and Jones kept telling him that he would not die. He stated that Anthony was in shock and was scared. Jones explained that he had known Anthony his entire life. Jones was 15 years older than Anthony and helped raise him. Jones was there when the ambulance arrived and helped get Anthony onto the stretcher. He got into the back of the ambulance with Anthony, but the paramedics had him leave when they

14

could not get the IV started. After that, detectives started asking him questions. After answering the questions, Jones went to see his uncle, Vernell Jones, to get a cigarette and defendant was there. He did not speak to defendant. He just got the cigarette and left.

¶ 38 On cross-examination, Jones agreed that he could only assume that the initial car he heard was Anthony being dropped off because he did not see the car, Anthony, or Terrance, the cousin who was supposedly bringing Anthony home. He explained that Terrance dropping off Anthony was just the daily routine. He agreed that he was not paying attention to who else was there when he was taking care of Anthony.

¶ 39 Officer Matthew Deschamps of the Illinois State Police crime scene unit testified that he attended Anthony's autopsy, which took place on June 30, 2022. He documented and photographed the autopsy. He identified photographs of Anthony, the wound, and Anthony's hands. Officer Deschamps testified that he also obtained the fingernail scrapings, hair follicles, and blood standards for DNA purposes. The items were later sent to the lab.

¶ 40 Special Agent Justin Haney of the Illinois State Police testified that he was the case agent and was responsible for gathering all relevant reports and presenting them to the State's Attorney's office. He stated that as part of the investigation a knife was found in a neighboring yard, but it was unrelated to this case. He explained that the knife was sent to the lab and tested but contained no forensic evidence connecting it to this crime. He confirmed that defendant's clothing was taken into evidence. He could not recall if they were stained or ripped. On cross-examination, Agent Haney agreed that he was informed that the pocket knife recovered was dropped by the homeowner of a nearby residence when he was mowing his lawn. He again agreed that no forensic evidence connected the knife to this crime.

15

¶ 41    During a break, the parties addressed the 911 call. Defense counsel continued to object to it being played for the jury. The court ultimately found the recording would be too prejudicial to defendant and disallowed the recording from being played.

¶ 42    Daniel Glover, a CSI with the Illinois State Police, testified that he was sent to Carbondale Memorial Hospital after Anthony died to take photographs of the victim and collect the victim's personal belongings. He identified the photographs taken at the hospital and confirmed that he also collected blood standards, DNA, and clothing from defendant while he was at the hospital.

¶ 43    On October 6, 2023, Suzanne Kidd, a forensic biologist with the Illinois State Police Crime Lab in Belleville, Illinois, testified about her DNA testing. She found no blood on defendant's t-shirt and no human DNA in defendant's fingernail scrapings. Kidd stated that the blood found on Anthony's sweatpants was from Anthony and defendant was excluded as a contributing source of that blood. Testing from Anthony's fingernail scrapings did not contain defendant's DNA either.

¶ 44    Dr. Christopher Kiefer, a forensic pathologist, testified that he performed Anthony's autopsy. He stated that Anthony's stab wound was approximately five inches and the weapon struck Anthony's heart in the right ventricle. The cause of death was sharp force trauma of the chest from a single stab wound to the heart. On cross-examination, Dr. Kiefer stated that he saw no other abrasions on Anthony.

¶ 45    Following Dr. Kiefer's testimony, a stipulation was read to the jury that stated, "The knife mentioned by Agent Justin Haney in his testimony belonged to a neighbor who had lost it while mowing on June 29, 2022, and it was not in any way related to the death of Kerry Tyress Anthony." After the stipulation was read, the State rested.

¶ 46    Defense counsel moved for a directed verdict, which the court denied. Defendant confirmed he would not be testifying. Brandon Roland, a paramedic/firefighter from Carterville,

16

testified that he and Perry Watkins were dispatched to the Johnson Street residence in Colp on June 30, 2022, for a suspected stabbing. When he got to the address, Roland observed Anothony with a stab wound sitting in a chair outside the house. Law enforcement was already on scene. Anthony was alert, verbal, and remained conscious during the 10-15 minutes before he was loaded into the ambulance. Roland believed the injury was serious but did not believe it was fatal upon his initial assessment. Roland stated that he did not witness Anthony speaking with law enforcement. Nor did Roland hear Anthony say, "Nathan Clark stabbed me." Once Anthony was in the ambulance, Roland continued assessments, took vitals, and placed an IV while preparing to transport. Roland testified that Anthony appeared to seize during the trip to Carbondale, which had the nearest trauma hospital.

¶ 47 On cross-examination, Roland agreed that his focus was on Anthony and not what was going on around him. Roland stated that Anthony told him that he had been stabbed. Roland did not know what type of knife was used. Roland was shown his report and agreed that he wrote that Anthony told him he was stabbed with a kitchen knife. He stated that after the seizure-like activity, Anthony was unresponsive. His heart slowed down and he eventually stopped breathing. Roland stated that he thought Anthony was having a panic attack while they were on scene and ignored any speaking that occurred around him.

¶ 48 On redirect examination, Roland stated that he was the closest person to Anthony while they were on scene. He never heard Anthony say anything about who stabbed him.

¶ 49 Perry Watkins, an EMT/firefighter from Carterville, Illinois, testified that he was dispatched with Roland to the scene. When they arrived, Watkins saw Anthony sitting in a plastic yard chair and he appeared to have trouble breathing. Watkins stated that Anthony could speak in short sentences, was responsive, and was awake enough to understand verbal commands.

17

Anthony's shirt was removed at the scene, and they saw an inch gash in Anthony's left chest. Anthony was removed from the chair, placed on a stretcher, secured, and taken to the ambulance. Watkins thought they were on scene about five minutes. He stated that officers were present, and he only recognized Officer Dobbins. He explained that law enforcement arrived first and the ambulance was staged back until the scene was secured. Watkins drove the ambulance away from the scene. He stated that he did not hear Anthony state that "Nathan Clark stabbed me."

¶ 50 On cross-examination, Watkins stated that the ambulance was staged a few blocks from the scene, where they waited for a brief time, until they were told the scene was clear. After Anthony seized, Watkins radioed the Carterville Fire Department to pick up another person to help Roland. He did not remember any of the questions asked by Roland at the scene. He stated he was more focused on the patient than trying to remember what was being said at the scene. On redirect, Watkins confirmed that Roland was in charge and was the one who asked the questions.

¶ 51 Following Watkins's testimony, the defense rested. Defense counsel renewed its motion for a directed verdict, which was denied. Closing arguments were presented and the jury instructions were read. Included in the instructions was the statement that, "Any evidence that was received for a limited purpose should not be considered by you for any other purpose."

¶ 52 The jury was sent to deliberate around 3:10 p.m. and sent a question to the court at 4:35 p.m. that asked, " 'Nathan Clark stabbed me.' There was an objection. Was that deemed hearsay." The court and the parties discussed the note and defense counsel stated, "technically, the answer to that is yes, it is hearsay *** but is admissible." The parties researched the issue. Relying on *People v. Ochoa*, 2017 IL App (1st) 140204, ¶ 57, the State recommended the court advise the jury that hearsay testimony was introduced for the limited purpose of explaining what caused the police to act and the jury should not accept the statement as true. Defense counsel agreed. The trial court's

18

jury response stated that the testimony of Officer Fann was introduced for the limited purpose of explaining what caused the police to act and the jury was not to accept the statement as true.

¶ 53    A few hours later, the court received a second note that stated, "We are deadlocked." The court noted that the jury had not even deliberated for three hours and stated it would provide a *Prim* instruction to the jury. The State and defense counsel replied, "Okay." Thereafter, the *Prim* instruction was read, and the jury returned to deliberate. Approximately 13 minutes later a third note was received from the jurors that stated, "I am supposed to pick up my significant other from the airport as he is returning from work. Would it be possible to let him know that I may not be there, and he will need to rent a car?" The court stated it would not allow the jurors to have their phones and asked for recommendations. The State suggested the juror give the phone number to one of the bailiffs to make the call. Defense counsel stated she had no objection to the suggestion. The court's response stated, "You may give the telephone number of your significant other to one of the bailiffs so they may notify them of your circumstance." Both parties verbally expressed their agreement with the language. At 7:21 p.m., the court received a fourth note, stating the jurors reached a verdict. The jury found defendant guilty of first degree murder. The jurors were not polled. A PSI was ordered and defendant's bond was rescinded.

¶ 54    On October 25, 2023, defense counsel filed a motion for a new trial. Relevant to the issues raised in this appeal, defense counsel alleged the following errors: (1) the trial court erred in reversing its decision and admitting the hearsay evidence of Teran Jones as an excited utterance after previously ruling the testimony was inadmissible, (2) the trial court erred in denying defendant's motion to dismiss for violation of his right to a speedy trial, (3) the trial court erred in allowing the State to elicit hearsay testimony from Officer Terry Fann which was specifically prohibited by the court's pretrial order, and (4) defendant was denied a fair trial based on the

19

cumulative errors. On January 12, 2024, defense counsel filed an amended motion for new trial which included two additional errors which are not relevant here.

¶ 55    Arguments on defendant's motion for new trial were presented on February 22, 2024. The court requested a copy of the transcript regarding Deputy Fann's testimony and took the matter under advisement. On March 7, 2024, the court orally denied the motion for a new trial.

¶ 56    Defendant's sentencing hearing occurred on April 30, 2024. Additional prior convictions were added to those set forth in the PSI. Clarification as to petitions to revoke sentences related to those prior convictions was also addressed. The State called Stacy Anthony, the victim's uncle, to testify. He stated that when he arrived at the scene Anthony was already in the ambulance. He explained that Anthony was born premature, only weighed two pounds at birth, and everyone took care of him as if he were their child. While his nephew had been in trouble previously, he was working and trying to get his life back on track when he was killed. The loss was devastating to the family. He testified that he also knew defendant and claimed he was always an "unsavory character" and "not a good person." He stated that defendant had a violent reputation because he had stabbed people in the past and was a troublemaker. He asked the court to set a sentence so that defendant would "never get out."

¶ 57    A victim impact statement from Anthony's mother was read. Thereafter, defendant provided a statement in allocution, stating that he was sorry for the family but that he did not commit the crime. He then complained about events that occurred during the trial. Eventually, the trial court stopped defendant and said, "I've heard enough that we have a problem." Defense counsel then requested a *Krankel* hearing. After the trial court found that none of the seven issues raised by defendant about his trial counsel had merit, the court returned to the sentencing hearing.

¶ 58    The State argued defendant's criminal history, noting this was not the first time defendant had stabbed someone, although it was the first time defendant killed someone. The State argued that despite numerous past convictions and sentences related thereto, defendant failed to rehabilitate. The State argued that defendant's past behavior was indicative of his future, noting defendant was 60 years old and had not changed in the last 30 years. The State recommended the maximum penalty of 60 years.

¶ 59    Defense counsel agreed that defendant had a prior criminal history but argued that defendant was also a father who was an honorably discharged veteran of the National Guard who served a tour in the Persian Gulf in the 1990s. Counsel argued that defendant was also a grandfather and defendant's mother was the current village president of Colp. Counsel argued that defendant had strong family support and requested the court sentence defendant to 20 years.

¶ 60    The court listed the materials considered and then addressed factors in aggravation. It considered the fact that defendant's conduct caused or threatened serious harm, noting that a man was killed. It also considered defendant's prior history of criminal activity consisting of at least 15 misdemeanor convictions and 6 felony convictions. The court also noted that defendant was previously convicted of acts of violence including domestic violence, battery, aggravated assault, and the resulting sentences handed down for those convictions. The court found no factors in mitigation beyond the fact that defendant was a father. It noted, however, that there was no indication that defendant was financially supporting his adult children. The court also considered defendant's rehabilitation potential and noted that defendant was in his 60s and had a criminal history going back to the 1980s. It commended defendant on his prior military service but noted that a "life was taken" and the court was obligated to follow the statute which had a sentencing range of 20 to 60 years. The court stated that it also considered the history, character and attitude

21

of the defendant, noting that "to this day he denies being at fault." Thereafter, the court sentenced defendant to 40 years in the IDOC.

¶ 61    The court admonished defendant that he had the right to reconsider his sentence and if so, the request had to be filed within 30 days and following any ruling, defendant could appeal the issue. Defendant stated that he understood. The court also admonished defendant that he had a right to appeal the guilty verdict. Defendant again stated that he understood. Defense counsel then advised the court that she had prepared a notice of appeal and a motion for appointment of counsel on appeal, stating, "Our relationship took a bit of an adversarial turn, but I am willing to file that if [defendant] wishes me to do so." Defendant replied, "I wish for her to file that." As such, defendant timely appealed.

¶ 62                                II. ANALYSIS

¶ 63    On appeal, defendant contends that his right to speedy trial was violated, improper and prejudicial testimony from the deceased was admitted into evidence, and the jury was placed in a coercive environment when it (a) had to deliberate after 6 p.m. without supper, (b) a juror was unable to call her partner to tell him she could not pick him up at the airport, and (c) the judge gave a *Prim* instruction after only three hours of deliberations. Defendant also claims that his trial counsel was ineffective for failing to file a motion to reconsider his sentence when the judge considered a factor inherent in the crime.

¶ 64                                A. Speedy Trial

¶ 65    "Both the United States Constitution and the Constitution of Illinois guarantee an accused the right to a speedy trial." *People v. Kaczmarek*, 207 Ill. 2d 288, 293-94 (2003) (citing U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8). "An accused also has a statutory right to a speedy trial under section 103-5 of the Code of Criminal Procedure of 1963 (speedy trial statute), which

22

specifies the periods of time within which an accused must be brought to trial." *People v. Kliner*, 185 Ill. 2d 81, 113-14 (1998). "The constitutional and statutory provisions address similar concerns; however, the rights established by each of them are not necessarily coextensive." *Id.* at 114. Here, defendant asserts only a statutory violation of his right to a speedy trial.

¶ 66 "Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he or she was taken into custody unless delay is occasioned by the defendant." 725 ILCS 5/103-5(a) (West 2022). The speedy trial period is 160 days from the date a defendant demands trial if the defendant is not in custody. *Id.* § 103-5(b) (West 2020). A case may be continued upon request by the State for not more than an additional 60 days if the State has exercised due diligence but was unsuccessful in obtaining material evidence or an additional 120 days if the State has exercised due diligence but was unsuccessful in obtaining material DNA testing results. *Id.* § 103-5(c).

¶ 67 Whether a trial court acted properly in granting the State's continuance request is reviewed for an abuse of discretion. *People v. Battles*, 311 Ill. App. 3d 991, 995 (2000). We review *de novo* the ultimate issue of whether defendant's right to a speedy trial was violated. *Kaczmarek*, 207 Ill. 2d at 295 (citing *People v. Crane*, 195 Ill. 2d 42, 52 (2001)).

¶ 68 In the case at bar, defendant was placed into custody on June 30, 2022, and remained in custody for this offense until he was granted a recognizance bond on December 2, 2022. During that time, the State moved for one continuance on September 16, 2022. It requested 60 days from the previously scheduled trial date of October 11, 2022, contending that it was waiting for DNA results, lab testing and reports. In support of the request, the State argued that Betty from their office had been calling the Illinois State Police crime lab every week and the officers were calling for the autopsy results. The State further indicated that both the crime lab and the autopsy office

23

were reminded that defendant requested speedy trial each time they called. Over defendant's objection, the trial court granted the motion, and the case was reset for trial on December 12, 2022. At the time of the State's request, defendant was at 90 days in the speedy trial count with the 120th day running on October 30, 2022. When the State required additional time, it moved to release defendant on a recognizance bond of $1 million and, at the same hearing, requested an increase in defendant's bail related to aggravated battery charges that had recently been filed. Ultimately, the court granted both motions despite defendant's objection to the latter, and it was on this basis that defendant maintained his claim of a speedy trial violation as seen in his later filed motion to dismiss and posttrial motion.

¶ 69    On appeal, unlike the argument presented below, defendant now contends, citing *Battles*, 311 Ill. App. 3d 991, that the State failed to show due diligence. It is well settled that preservation of a purported error for consideration by a reviewing court requires the defendant to object to the error at trial and raise the error in a posttrial motion. *People v. Sebby*, 2017 IL 119445, ¶ 48. Failure to do both results in forfeiture of the issue unless plain-error review is requested. *Id.* Here, neither defendant's brief, nor his reply brief requested plain-error review. As such, the issue is forfeited.

¶ 70    Instead, defendant contends, in the alternative, that his trial counsel was ineffective for failing to argue that the State failed to show due diligence in obtaining its evidence at the hearing. Claims of ineffective assistance of counsel are reviewed under the two-prong deficiency and prejudice standard enunciated in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). See *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). The deficiency prong requires a defendant to show that his "counsel made errors so serious, and that counsel's performance was so deficient, that counsel was not functioning as the 'counsel' guaranteed by the sixth amendment." *People v. Griffin*, 178 Ill. 2d 65, 73 (1997). "A court measures counsel's performance by an objective standard of

24

competence under prevailing professional norms." *Id.* The prejudice prong requires a defendant to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 74. This requires a showing that "counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Id.*

¶ 71 In support of this claim, defendant contends that "it was objectively unreasonable for counsel not to follow up on the specific objection by raising the issue in the motion to dismiss and in the post-trial motion." However, counsel did raise a speedy trial violation issue in both a motion to dismiss and her posttrial motion. The only difference was that defense counsel's argument focused on the increased bail on the recently filed aggravated battery charge instead of arguing that the State failed to show due diligence at the hearing on the motion for continuance.

¶ 72 Notably, the parties advised the court of the State's "due diligence" requirement at the hearing. The State also provided the steps taken since the evidence was sent to the lab to retrieve the DNA results and the autopsy report. Further, by the time of the hearing, which is the time frame this court is required to consider (see *People v. Terry*, 312 Ill. App. 3d 984, 990 (2000)), the State had previously advised the court numerous times of its efforts and the difficulties with obtaining the evidence.

¶ 73 The record revealed that at the time of the probable cause hearing on July 15, 2022, Agent Haney testified that the pathologist's preliminary report was all that was available at that time. He further testified that defendant's clothing was taken, a knife was collected, and blood spatter panels were collected and sent to the lab. Agent Haney also confirmed that some audio and video interviews had been taken and that forensic testing was performed on defendant that included buccal and fingernail swabs. On August 5, 2022, the State advised the court and defense counsel

25

that it had received its discovery from the Illinois State Police. On August 15, 2022, defense counsel noted that he had received some discovery. He further noted there was "a significant amount missing" but the State had provided everything they currently had in their possession. At that time, the State indicated its intent to follow up with each individual law enforcement agency.

¶ 74 On August 29, 2022, defense counsel stated there were still numerous missing items and the State agreed. It advised the court that it had been in contact with the officer responsible, but the officer in charge of gathering the reports was currently working at the State Fair and told the State that he would get on the officers when he got back to the office but was dependent on other people providing him the documents. The parties reconvened on September 16, 2022, which was when the State requested the 60-day continuance from the October 11, 2022, trial date. At that time, the State reported that it was still waiting on DNA reports from the crime lab and the autopsy report. The State further advised that Betty was calling the Illinois State Police Crime lab every week, the officers were also calling for the autopsy results, and both offices were advised during every call that defendant was requesting speedy trial.

¶ 75 "Judicial scrutiny of counsel's performance is highly deferential, and a court considering an ineffectiveness claim 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " *People v. Sanchez*, 169 Ill. 2d 472, 487 (1996) (quoting *Strickland*, 466 U.S. at 689). Here, defense counsel and the court were well aware of the State's difficulties in obtaining the discovery and evidence, as well as the steps taken to timely obtain the evidence. As such, we cannot find that trial counsel's failure to raise the issue of the State's due diligence in the motion to dismiss or the posttrial motion was objectively unreasonable, especially when counsel did raise a speedy trial issue in both pleadings on a different

basis which this court presumes was a strategic tactic. Accordingly, we deny defendant's alternative claim of ineffective assistance of counsel.

¶ 76                                B. Hearsay Testimony

¶ 77    " 'Hearsay' is an out-of-court statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Due to the lack of reliability associated with hearsay evidence, it is generally inadmissible unless it falls within an exception to the hearsay rule. *People v. Caffey*, 205 Ill. 2d 52, 88-89 (2001). Where a trial court exercised its discretion in making evidentiary rulings based on specific circumstances, we review the ruling for an abuse of discretion. *Id.* at 89-90. An abuse of discretion occurs "where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *Id.* at 89.

¶ 78    On appeal, defendant contends that the trial court erred by allowing hearsay using the course of investigation exception for Deputy Fann's testimony and also erred in allowing the excited utterance exception for Deputy Fann's testimony at the pretrial hearing. However, once again, our review of the record reveals these issues were not preserved by defendant before the trial court. Trial counsel's posttrial motion posed the issues as errors by the trial court: (1) in reversing the admissibility decision and admitting Jones's testimony as an excited utterance and (2) by allowing the State to elicit hearsay testimony from Officer Fann that was previously prohibited in the court's pretrial order. As to the latter issue raised by defense counsel, the State's use of a course of investigation hearsay exception for Deputy Fann's testimony was not raised except to claim that Fann's testimony was prohibited by the prior order. However, the court specifically allowed the excited utterance after finding the "statements of Deputy Fann and Jones

27

are not testimonial in nature." Therefore, any issue related to the excited utterance to Jones was discarded on appeal and the issue related to Deputy Fann's testimony was altered to encompass two issues never presented to the trial court.

¶ 79 To preserve an issue, a party must object at trial and include the issue in a posttrial motion. *People v. Jackson*, 2022 IL 127256, ¶ 15. "In criminal cases, [the Illinois Supreme Court] has held consistently that, to preserve an issue for review, a defendant must raise it in *either* a motion *in limine* or an objection at trial, *and* in a posttrial motion." *People v. Denson*, 2014 IL 116231, ¶ 18. As to the former issue, at no time was any argument regarding course of investigation addressed as to Deputy Fann's hearsay testimony during the hearing on the motion *in limine* or at trial. In fact, at trial, the sole statement regarding Deputy Fann's statement was "Objection, hearsay." Further, nothing in the posttrial motion discussed the "course of conduct" or "course of investigation" hearsay objection. Accordingly, we find that both issues raised on appeal were forfeited.

¶ 80 Here, unlike the speedy trial issue, defendant concedes that the exact issues raised on appeal were not preserved and therefore, requests first prong plain-error review. The plain-error rule, set forth in Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) is "a narrow exception to forfeiture principles." *Jackson*, 2022 IL 127256, ¶ 18. It "does not call for the review of all forfeited errors." *Id.* ¶ 19 (citing *People v. Precup*, 73 Ill. 2d 7, 16 (1978)). It applies only where (1) the evidence is "so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence, or (2) when a clear or obvious error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Id.*

¶ 81 The first step in the analysis requires this court to determine whether a clear or obvious error occurred. *Id.* ¶ 21. On appeal, defendant contends that the trial court's allowance of Deputy

Fann's hearsay testimony under either the excited utterance or the course of investigation exception was erroneous. An appellate issue is moot when no actual controversy exists, or events occur that "make it impossible for the reviewing court to render effectual relief." *Commonwealth Edison Co. v. Illinois Commerce Comm'n*, 2016 IL 118129, ¶ 10. Reviewing courts generally will not "decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *Id.* "When a decision on the merits would not result in appropriate relief, such a decision would essentially be an advisory opinion." *Id.* Here, defendant concedes that while the hearsay exception of excited utterance was allowed by the trial court, it was not utilized at trial. Such concession renders the issue moot and therefore, we consider only whether the trial court erred in allowing the State to present the testimony under the hearsay exception of "course of investigation."

¶ 82    "The 'course of investigation' exception to the hearsay rule allows the admission of statements that explain the progress of a police investigation under the rationale that such evidence is not offered for its truth." *People v. Williams*, 2023 IL App (1st) 192463, ¶ 95. "Such statements are 'offered for the limited purpose of showing the course of a police investigation.' " *Id.* (quoting *People v. Jura*, 352 Ill. App. 3d 1080, 1085 (2004)). The exception allows law enforcement personnel to testify about conversations with others, when such testimony is not offered to prove the truth of the matter asserted by the other, but is used to show the subsequent investigative actions taken by the officer. *Ochoa*, 2017 IL App (1st) 140204, ¶ 41. Despite the exception, the "officer should not testify to the contents of the conversation." *Jura*, 352 Ill. App. 3d at 1087. Further, naming the defendant and providing the full content or substance of the conversation is inadmissible. See *People v. Gacho*, 122 Ill. 2d 221, 248 (1988). Here, Deputy Fann testified to the exact quote from Anthony which stated, "Nathan Clark stabbed me." Further, the trial court failed

29

to provide a limiting instruction. See *Ochoa*, 2017 IL App (1st) 140204, ¶ 57. In such context, when other methods could have been utilized to show how the investigation unfolded with less detail, we find the trial court erred in allowing the statement as an exception to hearsay.

¶ 83    As noted above, defendant requested first prong plain error. "[E]rrors reviewable under the first prong of the plain error rules are the type of errors that are subject to harmless error analysis, and a defendant must establish prejudice resulting from the error to excuse his forfeiture of such an error." *Jackson*, 2022 IL 127256, ¶ 23 (citing *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). The burden of proof remains on defendant to establish the prejudice. *Herron*, 215 Ill. 2d at 187.

¶ 84    "It is axiomatic that whether the evidence in a criminal trial is closely balanced depends solely on the evidence adduced in that particular case." *People v. Naylor*, 229 Ill. 2d 584, 609 (2008). Guidance for addressing this issue was provided by the Illinois Supreme Court stating,

> "In determining whether the evidence adduced at trial was close, a reviewing court must evaluate the totality of the evidence and conduct a qualitative, commonsense assessment of it within the context of the case. [Citations.] That standard seems quite simple, but the opposite is true. A reviewing court's inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *Sebby*, 2017 IL 119445, ¶ 53.

Evidence may be closely balanced even if the defendant fails to testify or present evidence contradicting the challenged testimony. See *People v. Piatkowksi*, 225 Ill. 2d 551, 567-70 (2007). However, the evidence is generally not closely balanced when the challenged testimony is corroborated and uncontradicted and the witness has not been significantly impeached. *People v. Williams*, 2022 IL 126918, ¶¶ 64-65.

¶ 85    Here, the jury was only presented with one account of the event. Anthony's uncle, Teran Jones, testified that he heard screaming, got up from bed, and saw Anthony running up a small hill holding his chest with blood on his shirt. Upon seeing Anthony, Jones asked what happened and Anthony told Jones that he had been stabbed. When Jones asked Anthony who stabbed him, Anthony provided a name. When Jones saw defendant on the property, Jones verbally confronted defendant and asked defendant why he stabbed Anthony. In response, defendant stated, "He crossed the Clark group for the wrong last time." The evidence also revealed that when defendant was arrested, he repeatedly stated that his name was Everett and denied that his name was Nathan, despite having a prescription for Nathan Clark in his pocket. No alibi evidence presented and no evidence contradicted Jones's testimony which revealed that defendant did not deny stabbing Anthony and instead provided the motive for defendant stabbing Anthony. Further, at no time was Jones's testimony impeached. As such, we do not find the evidence closely balanced.

¶ 86    We further note that any claim of prejudice is undermined by that fact that even though Deputy Fann stated that Anthony named Nathan Clark as the person who stabbed him under the guise of a course of investigation hearsay exception, the jury heard the State advise the court that it was offering the out-of-court statement, "not for proving the truth of the matter asserted *** [m]erely to show the effect on the listener." Additionally, when the jury instructions were read, the instructions included language stating that, "Any evidence that was received for a limited purpose should not be considered by you for any other purpose." After the jury was sent to deliberate, it expressed concern as to how Deputy Fann's testimony, given the hearsay objection, should be considered. In response, the jury was advised that, "The testimony of Officer Fann was introduced for the limited purpose of explaining what caused the police to act and the jury is not to accept the statement as true." Therefore, the jury was specifically admonished to "not accept"

31

Officer Fann's testimony regarding who he was told stabbed Anthony as true. "The jury is presumed to follow the instructions given to it by the court." *People v. Fields*, 135 Ill. 2d 18, 53 (1990) (citing *Richardson v. Marsh*, 481 U.S. 200, 206-07 (1987)). Here, while no limiting instruction was provided immediately after the statement, the jury was advised as to how limiting evidence should be considered in the jury instructions and was specifically advised to not accept Deputy Fann's testimony about who stabbed Anthony. Accordingly, we deny defendant's claim of first prong plain error and hold defendant to the forfeiture.

¶ 87 Defendant also argues, in the alternative, that his counsel was ineffective for failing to include the course of conduct hearsay exception as it related to Deputy Fann's testimony as an issue in the posttrial motion. However, no argument was presented in support of the claim and therefore, we find the argument forfeited. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) ("Points not argued are forfeited.").

¶ 88                                              C. Juror Coercion

¶ 89 Defendant next argues that the jury was coerced into issuing its verdict. In support, defendant argues that (1) the *Prim* (*People v. Prim*, 53 Ill. 2d 62, 75 (1972)) instruction contained a misstatement of law; (2) the court refused to allow a juror to call her partner to advise that she would not be able to pick him up at the airport; and (3) the jurors were forced to deliberate without being provided either dinner or a dinner break. Defendant again admits that these errors were not properly preserved and requests review under both prongs of plain error. Alternatively, defendant asks this court to review the error as ineffective assistance of counsel for failing to properly preserve the issues.

¶ 90 In *Prim*, the Illinois Supreme Court acknowledged "the possible coercive dangers inherent in a supplemental instruction given to a deadlocked jury" but believed the jury should not "be left

32

to grope in such circumstances without some guidance from the court." *Id.* at 74. After reviewing the American Bar Association Project on Minimum Standards for Criminal Justice (*id.* at 74-76), the court held that adoption of standards would "resolve the many questions created by the uncertainty attendant upon instructing a jury that is in disagreement." *Id.* at 76. Thereafter, it directed that "when faced with deadlocked juries," the Illinois trial courts should "comply with the Standards suggested by the American Bar Association Minimum Standards Relating to Jury Trials." *Id.* "The supplemental instruction provided in IPI Civil No. 1.05 was derived from the *Prim* case." *Schilling v. Quincy Physicians and Surgeons Clinic, S.C.*, 2026 IL 131411, ¶ 42. Notably, use of the *Prim* instruction was affirmed in *Schilling* after finding the instruction "did exactly what it was intended to do by providing guidance to the deadlocked jury" and was "not inherently coercive." *Id.* ¶ 43.

¶ 91    In addition to a recent Illinois Supreme Court case contradicting defendant's claim of a coercive instruction, we further note that defendant's argument is precluded by the invited-error doctrine. The invited-error doctrine prohibits a party from requesting the court proceed or acquiescing in the court's planned manner and then arguing on appeal that the requested or the agreed to action was error. *People v. Carter*, 208 Ill. 2d 309, 319 (2003); *People v. Villareal*, 198 Ill. 2d 209, 277-28 (2001). Here, after the court advised the parties that it would provide a *Prim* instruction, both the State and defense counsel stated, "Okay" thereby acquiescing in the court's decision to present the *Prim* instruction. See *Cholipski v. Bovis Lend Lease, Inc.*, 2014 IL App (1st) 132842, ¶ 63. Further, there was no discussion or any concern voiced by defense counsel that would potentially lead this court to hold that the "okay" was not an acquiescence. See *People v. Hale*, 2025 IL App (3d) 220510, ¶¶ 98-99. As such, we find the issue is precluded by invited error which is "not subject to plain-error review." *People v. Ramirez*, 2013 IL App (4th) 121153, ¶ 79

33

(citing *People v. Sanders*, 2012 IL App (1st) 102040, ¶ 30; *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17). Accordingly, we find no merit in the first issue.

¶ 92    Defendant further argues that the trial court caused juror coercion when it refused to allow a juror to call a partner to explain that she would not be available to pick him up at the airport. This argument also fails. First, the juror's note did not specifically request use of a phone to personally contact the partner. The note stated, "I am supposed to pick up my significant other from the airport as he is returning from work. Would it be possible to let him know that I may not be there, and he will need to rent a car?" Second, after discussing the issue with the parties, it was determined that the juror would provide the number to a bailiff who would make the telephone call. The court's response stated, "You may give the telephone number of your significant other to one of the bailiffs so they may notify them of your circumstance." Both parties were in agreement with the language. As such, the request was fulfilled. Third, because defense counsel agreed with the proposed response to the juror, the invited-error doctrine again applies and therefore, plain-error review is precluded.

¶ 93    Defendant also contends that the lack of a dinner break or having dinner brought in during deliberations was evidence of juror coercion. Defendant's argument on this issue is based on the totality of the circumstances, including the juror trying to contact her partner. However, as noted above, defense counsel agreed with how the juror airport issue was handled, as well as the giving of a *Prim* instruction, the only circumstance is that the jurors last ate at 12:55 p.m. and deliberated until 7:21 p.m. with no dinner served. Notably, despite sending three notes to the court, none of the jurors requested either a break or a dinner meal. As such, we find the issue, as presented, insufficient to find juror coercion.

34

¶ 94     Finally, as an alternative, defendant contends that his trial counsel was ineffective for failing to object to the *Prim* instruction and the message returned to the juror whose partner was arriving at the airport later that evening. As noted above, ineffective assistance counsel claims are reviewed under the two-prong *Strickland* standard requiring seriously unprofessional errors that prejudiced the defendant. *Griffin*, 178 Ill. 2d at 73. Here, we can find no evidence of unreasonable performance for failing to object to the *Prim* instruction when the jury sent a note stating it was deadlocked as the instruction is not coercive. *Schilling*, 2026 IL 131411, ¶ 43. Nor can we find that defense counsel's acquiescence in allowing a juror's partner to be called by a bailiff so the partner is aware that the juror would not be at the airport to pick him up, unreasonable. Further, nothing in defendant's argument provides any other possible manner to address the situation or why dinner or a dinner break would be suggested when no juror indicated that it wanted dinner or a dinner break. For these reasons, we cannot find that defense counsel's failure to object on any of those bases was unreasonable and therefore deny defendant's claim of ineffective assistance of counsel related to juror coercion.

¶ 95                     D. Ineffective Assistance of Counsel

¶ 96     Finally, defendant contends that his trial counsel provided ineffective assistance by failing to request reconsideration of his sentence. We again disagree. Claims of ineffective assistance of counsel "may sometimes be better suited to collateral proceedings but only when the record is incomplete or inadequate for resolving the claim." *People v. Veach*, 2017 IL 120649, ¶ 46.

¶ 97     Here, the record is sufficiently complete and reveals that defendant was admonished of his right to request reconsideration of his sentence and verbally stated that he understood that right. He was then admonished of his right to appeal and again verbally stated that he understood. Thereafter, defendant's trial counsel offered to file the necessary paperwork for defendant's

35

appeal, but only if that was what defendant wanted her to do. The court questioned defendant on the issue and defendant stated, "I wish for her to file that."

¶ 98    "The rule of invited error or acquiescence is a procedural default sometimes described as estoppel." *In re Detention of Swope*, 213 Ill. 2d 210, 217 (2004). "Simply stated, a party cannot complain of error which that party induced the court to make or to which that party consented." *Id.* Here, defendant did more than consent to trial counsel filing a notice of appeal. He specifically stated, "I wish for her to file that." Under these circumstances, we cannot find that trial counsel's action of filing the notice of appeal was unreasonable. As the first *Strickland* prong cannot be met, we deny defendant's claim of ineffective assistance of counsel.

¶ 99                                      III. CONCLUSION

¶ 100   For the above stated reasons, we affirm the trial court's judgment and sentence.


¶ 101   Affirmed.